IN THE UNITED STATES DISTRICT COURT
 FOR THE [SPECIFY DISTRICT] DISTRICT OF [STATE]

UNITED STATES OF AMERICA,
 ex rel. [YOUR NAME],
      Plaintiff–Relator,

v.

- U.S. DEPARTMENT OF TRANSPORTATION
- CALIFORNIA DEPARTMENT OF TRANSPORTATION ("Caltrans"), and:
  - DINA EL-TAWANSY, Director
  - VELESSATA CLEMMONS, Chief of Staff
  - KIMBERLY ELLIS-ERICKSON, Division Chief, Right of Way & Land Surveys
  - JEREMY KETCHUM, Division Chief, Environmental Analysis
  - RICH FOLEY, Division Chief, Engineering Services
  - DONNA BERRY, Deputy Director Project Delivery / Chief Engineer
  - KRISTEN KINGSLEY, Acting Division Chief, Project Management
- CITY AND COUNTY OF SAN FRANCISCO
- SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, and:
  - DIRECTOR JEFFREY TUMLIN, in official capacity
  - SFMTA BOARD OF DIRECTORS
- SAN FRANCISCO COUNTY TRANSPORTATION AUTHORITY, and:
  - TILLY CHANG, Executive Director
- SAN FRANCISCO MAYOR LONDON BREED
- SAN FRANCISCO BOARD OF SUPERVISORS, and:
  - PRESIDENT AARON PESKIN
  - SUPERVISORS CONNIE CHAN, RAFAEL MANDELMAN, MYRNA MELGAR
- METROPOLITAN TRANSPORTATION COMMISSION, and:
  - DIRECTOR JEFFREY TUMLIN (MTC role)
- THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, on behalf of:
  - UC Berkeley, Department of History

- o UC Berkeley School of Law (formerly Boalt Hall)
- COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, on behalf of:
  - o Columbia University Department of Physics (successor to its Metallurgical Department)
- AT&T INC., and its subsidiaries
- MARIN COUNTY BOARD OF SUPERVISORS, consisting of:
  - o MARY SACKETT (District 1)
  - o BRIAN COLBERT (District 2)
  - o STEPHANIE MOULTON-PETERS (District 3)
  - o DENNIS RODONI (District 4)
  - o ERIC LUCAN (District 5)
    marincounty.gov+1marincounty.gov+1en.wikipedia.org+4en.wikipedia.org+4cbsnews.com+4
- POINT REYES NATIONAL SEASHORE MASTER LEASEHOLDERS, including:
  - o Evans/Rossotti Family (Units 12, 13, 18)
  - o D. Evans (Units 10 "AT&T Ranch" & 21)
  - o Gallagher Family (Unit 9) npshistory.com+9nps.gov+9nps.gov+9
- [OTHER PROPOSED CONSPIRATORS],

  Defendants.


This case involves grave violations of public trust implicating public health, civil rights, and institutional corruption.

Government agencies, elected officials, and powerful individuals exploited their positions of authority to unlawfully benefit themselves and their affiliates—at the direct expense of the American public. Through a series of deceptive land acquisitions, undisclosed real estate transfers, and fraudulent certifications, these parties undermined the express intent of Congress and misappropriated federal funds earmarked for public conservation.

On September 13, 1962, Congress enacted Public Law 87-657, authorizing the establishment of the Point Reyes National Seashore in Marin County, California. The statute empowered the United States Department of the Interior (DOI) to

acquire lands necessary for the Seashore's creation, either through direct purchase or by exchange. To facilitate this, Congress initially appropriated $14 million, a figure that expanded across successive administrations to an estimated $100 million in federal funds expended for the Seashore's development and protection.

In furtherance of this mandate, the federal government engaged in both cash purchases and IRS Section 1031 "like-kind" exchanges, transferring other valuable government-held lands in exchange for private lands on the Point Reyes Peninsula. These transactions were intended to serve public interests—specifically, environmental preservation and public access. Instead, many were carried out in a manner that concealed private profiteering, long-term exclusive leases, and illicit coordination between public agencies and private entities.

In 1948, the U.S. Supreme Court in *Shelley v. Kraemer*, 334 U.S. 1 (1948), struck down the enforcement of racial covenants in residential real estate, effectively outlawing legally enforceable segregation in housing. This landmark decision made it illegal to use courts to enforce agreements that prohibited selling property to certain racial groups, signaling a critical blow against systemic housing segregation.

Following this, in 1950, the Supreme Court continued to dismantle institutionalized racial segregation by ruling in *Henderson v. United States* that racially segregated railroad dining cars traveling across state lines were unconstitutional.

The 1960s ushered in sweeping changes to race relations in America, including new laws to combat racial profiling and discrimination. In the 1970s, the nation underwent significant reforms in environmental legislation, reflecting growing awareness and activism around social justice and ecological protection.

Faced with the dismantling of overt segregation through these rulings and societal changes, defendants sought new and covert methods to maintain racially segregated communities in the West Coast, particularly in the Bay Area.

Where there is smoke, there is fire — here, there exists a calculated white conspiracy linked historically to extremist groups such as the Ku Klux Klan and

associated eugenics advocates who were affiliated with the University of California, Berkeley.

The so-called "brass plate" hoax was orchestrated by Professor Bolton and his associates, who were likely connected to such groups or the Western equivalent, *E Clampus Vitus*. This fabricated historical narrative was weaponized to justify and sustain racially exclusionary land policies, effectively keeping Berkeley and much of the Bay Area as white-dominated as possible.[1]

All persons are equal before the law regardless of race, national origin, citizenship, or corporate status. However, those who make laws and control the legislative process—armed with advanced notice of societal changes—are uniquely positioned to exert undue influence and exploit the system for their own benefit.

In Northern California, powerful interests managed to sidestep racial integration in their communities despite laws like the California Rumford Housing Act and Supreme Court rulings. They did this by blocking the development of new housing, especially affordable homes that young Americans, immigrants, and minorities could purchase. Through racially motivated gerrymandering, these elites artificially limited housing supply, maintaining segregation and exclusion.

One example is the Shafter family, elite San Francisco lawyers and judges, who owned major portions of the Point Reyes Peninsula for over 80 years—from 1857 to 1939. Oscar Shafter was the first American owner of the largest tract of land in what is now Point Reyes National Seashore. The Shafters were also dairy farming experts who helped develop the area into the world's largest dairy farm in the 1920s. After the 1929 stock market crash and rapid urbanization, the last Shafter heir sold the land to real estate developers targeting WWII and Korean War veterans moving to the Bay Area—accelerating suburbanization in Marin County.

The persistent myth of the "Brass Plate" at Point Reyes—purportedly left by Francis Drake as a marker of his secret landing—is deeply tied to this racial and economic exclusion. This myth, propagated by biased university researchers and local officials, draws on Protestant Christian symbolism of offering plates, while also invoking misleading cultural analogies like tectonic plates or Chinese

---

[1] https://www.saturdayeveningpost.com/2018/03/francis-drakes-golden-plate-hoax-backfired/

Point Reyes False Claims Act                                                5
Complaint

porcelain plates. The myth deliberately misleads visitors and immigrant
communities, including Chinese Americans, by conflating history with folklore to
obscure the true motives behind the land preservation.

These false narratives serve powerful interests who profited financially and
politically from the creation of the National Seashore, using Native American,
Latino, and Chinese cultural references to repackage and legitimize their agenda.
This fraudulent scheme helped justify restrictions on development, contributing to
ongoing homelessness, segregation, and social disparities.[2]

Congressional records show mixed public opinion during the park's creation, with
some children supporting it and others warning that population growth must align
with affordable housing supply to maintain a healthy society.

During the 1960s, the designation of Point Reyes as a National Seashore by
President JFK coincided with universities like Columbia and Berkeley supporting
the Brass Plate myth to legitimize the park and its exclusionary policies. These
institutions and Marin County officials all benefited from the resulting fraud,
which included federal funding for infrastructure projects like the Golden Gate
Bridge and the Geary Expressway—yet these developments were used to further
racial and economic segregation by restricting growth in Marin County.

Historically, the American Southwest—including California, Oregon, and
Washington—was Spanish territory. Under the Treaty of Guadalupe Hidalgo,
Mexican citizens living there were granted U.S. citizenship, along with legal
equality. However, discriminatory real estate practices and zoning laws effectively
segregated Mexican, Black, and other minority populations into isolated enclaves.

Until the 1960s, Asians were barred from U.S. citizenship by law (Title 8, U.S.
Code), which maintained racial exclusion and confined Asian immigrants to
ghettos and Chinatowns in major cities. Even after the repeal of these laws,
Chinese and other Asian Americans in San Francisco continued to face systemic
discrimination in employment, housing, education, and healthcare.

---

[2] https://ohp.parks.ca.gov/pages/1067/files/CHL_Marin_Site%20of%20New%20Albion.pdf

This discrimination culminated in the violent bulldozing of the Geary Corridor—
particularly in the Richmond District—ostensibly to accommodate traffic to Marin
County. In reality, this was a targeted attack on a thriving minority community
driven by greed, racism, and lies. The segregationist planners falsely claimed it
was "urban renewal" and "proper planning," deceiving state and federal authorities
with fabricated data and motives.

This complaint seeks to hold accountable the parties who knowingly submitted or
caused the submission of false or fraudulent claims, certifications, or records to the
federal government in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733.

Plaintiff-Relator is a college-educated historian and an attorney with a professional
focus on political corruption, public fraud, and governmental abuse of power. The
Plaintiff has conducted in-depth historical and legal research into land ownership
patterns, public land management, and the misuse of federal authority, particularly
as it relates to real estate monopolies that have artificially inflated housing costs in
the San Francisco Bay Area. This qui tam action is part of a broader effort to
expose and remediate the systemic corruption that underpins public-private land
arrangements and contributes to regional economic inequities.

While researching the historical inaccuracies surrounding the National Park
Service's claim that Sir Francis Drake landed at Point Reyes, Plaintiff uncovered a
broader pattern and practice of misconduct. This pattern involves coordinated
actions by government agencies, politically connected individuals, wealthy
landowners, and corporate actors to exploit federal land programs for private
financial gain—contrary to the statutory purposes of federal conservation laws,
including those governing the Point Reyes National Seashore.

Historically, Point Reyes was inhabited by Indigenous nations prior to European
colonization. After colonization, the land was developed for commercial
agriculture and ranching. As those industries became increasingly obsolete and
economically unsustainable, politically connected landowners and their
government allies repurposed the area—reframing it as a site of purported
environmental and historical significance, and leveraging that narrative to justify
continued control through exclusive leases, land swaps, and favorable public
policies.

Point Reyes False Claims Act                                                                                    7
Complaint

In reality, Plaintiff contends that the environmental and recreational justifications for the land's federal designation and continued restricted use were materially misrepresented to the public and to Congress. The land does not constitute a unique biome nor a site of verified major historical significance, as claimed. Rather, it was fraudulently packaged and marketed by a select group of insiders—including public officials—with the intent to maintain land monopolies, divert public funds, and manipulate public perception under the guise of conservation and recreation.

These misrepresentations formed the basis for a series of false claims, certifications, and land transactions, all conducted in violation of federal law and at the expense of the public interest.

## III. Pattern of Fraud, Environmental Misrepresentation, and Public Harm

The defendants named in this complaint, along with other affiliated entities, knowingly engaged in a course of conduct that misled the federal government and the public regarding the historical, environmental, and recreational value of the Point Reyes National Seashore. This deception was not incidental—it was deliberate and calculated to secure exclusive control over valuable public land for private benefit.

Among the most prominent misrepresentations was the claim that Sir Francis Drake made landfall at Point Reyes, a historical assertion used to support the designation and continued federal funding of the area as a site of major national significance. This claim, lacking credible archaeological or scholarly evidence, was strategically used to block development and keep federal control over the land—benefiting certain politically connected landholders and corporate interests. [See e.g., *National Park Service promotion materials; Relator research.*]

Powerful corporate and industrial interests—including Westinghouse, Pacific Bell (now AT&T), and large-scale agribusiness operators in Marin County—have historically used and profited from the Point Reyes region. These entities benefited from decades of exclusive, low-cost access to federal land, during which time they did not pay fair market value for its use. In many cases, they operated under preferential leases or informal arrangements that violated the spirit and letter of federal land use laws.

Meanwhile, the land's usage caused environmental degradation that remains underreported and unacknowledged by the federal government. The region has a documented history of industrial activity linked to defense and aerospace operations, including what Plaintiff believes to be a covert Nike missile installation in Marin County. The site was allegedly used to transport and maintain nuclear missiles, during which time hazardous waste, including trichloroethylene (TCE) and other volatile organic compounds, were disposed of in ways that harmed the ecosystem and surrounding communities.

This toxic legacy has had serious public health consequences. According to cancer surveillance data from UCSF and other sources, Marin and San Francisco Counties have significantly elevated breast cancer rates compared to national averages. [See, e.g., UCSF Cancer Registry Reports, 1988–2019; NJ Cancer Burden Report (used for comparative context).] Despite the accumulation of public health data, the federal government has failed to acknowledge or investigate the possible environmental and chemical exposure risks stemming from this period of military and industrial use.

The Marin County National Seashore's history as a former Nike missile base is still not officially acknowledged by the federal government, nor have its potential environmental and health impacts been subject to full public disclosure.

We may never fully know the extent of the **environmental contamination** resulting from the military's covert use of the Point Reyes Peninsula and surrounding federal lands under the guise of conservation or park development.

Despite public presentation of the area as a protected National Seashore, multiple indicators suggest that the land was used, at least in part, to **house or support Cold War-era military installations**, including possible **Nike missile launch or radar tracking sites**, underwritten by Department of Defense funding streams often concealed within National Parks Service or Department of the Interior budget lines.

Although decades have passed, **civilians today have access to Cold War-era technology**—notably declassified satellite imagery, open-source defense archives, and online geospatial databases. These publicly available tools, when used

alongside Plaintiff's firsthand observations, strongly suggest the presence of **multiple suspicious military-related sites across the peninsula**.

In particular, Plaintiff observed numerous features—such as elevated berms, concrete foundations in non-public areas, and restricted communications infrastructure—that are consistent with Cold War missile or surveillance installations.

The **communications center located near the current Coast Guard station** in the central part of the peninsula appears to have been, or continues to serve as, a strategically situated transmission node for military activities during the Cold War.

This concealment contributes to a continuing pattern of false certifications and omissions, particularly in connection with environmental assessments, federal land reporting, and congressional appropriations tied to the Point Reyes site.

## IV. Historical Secrecy, Environmental Contamination, and Public Deception

Since the end of World War II, Marin County has played a concealed role in the Cold War military-industrial complex, selected in part due to its proximity to the University of California system and its population of highly educated professionals. During this period, portions of the Point Reyes Peninsula were used for military research and weapons development, including secret missile and chemical testing programs. However, until well into the 2000s, Marin County failed to report numerous environmental spills and hazardous incidents to state or federal authorities. As a result, critical environmental data remains missing from public and regulatory databases, impairing health studies, land assessments, and accountability.

The United States Coast Guard maintains a base and residential facilities at Point Reyes, and other branches of the military also maintain a footprint in the area. Without comprehensive testing and historical disclosure, residents—including service members and their families—may face increased risks of exposure-related illnesses, including long-latency conditions associated with volatile organic compounds (VOCs), like trichloroethylene (TCE).

Although the site is no longer used for overt weapons testing, Point Reyes continues to be leased for commercial agriculture, a known contributor to persistent organic pollution, soil degradation, and water contamination. Despite this, the Defendants have continued to represent Point Reyes as an ecologically pristine and historically sacred federal parkland, in contradiction to its true environmental condition. These misrepresentations support ongoing land leases, funding renewals, and zoning restrictions that exclude private development and skew regional housing availability.

Rather than serving as a genuine conservation site, Point Reyes functions as an environmental cleanup zone, complicated by both legacy Cold War contamination and modern agribusiness waste. It is not a true national park in either spirit or condition. The Defendants have utilized this false narrative to sustain control over valuable land and to justify exclusionary housing and land use policies throughout the Bay Area—policies now being emulated nationwide under the guise of environmentalism.[3]

The consequences are devastating. These schemes contribute to the national housing crisis and rising homelessness, as government entities and politically connected individuals deploy environmental rhetoric to maintain zoning monopolies, restrict property access, and manipulate voting and economic power. The loss of public tax revenue caused by this monopolization—through fraudulently obtained federal land leases, suppressed land values, and disqualified development—is in the trillions of dollars.

A cornerstone of this deception is the false claim that Sir Francis Drake landed at Point Reyes in the 16th century. In truth, credible historical and academic sources place Drake's landing much farther north, possibly in modern-day Oregon or Washington. Nonetheless, the Defendants continue to promote the Point Reyes landing myth to sustain the site's manufactured historical importance. [See *Thunder Go North* (OHS Press); *National Park Service Explorer Profiles*; *SFGate Reporting on Historical Designation*].

---

[3] https://ohp.parks.ca.gov/pages/1067/files/CHL_Marin_Site%20of%20New%20Albion.pdf

Moreover, Defendant institutions—specifically Columbia University and the University of California, Berkeley—have knowingly benefited from these deceptions. With billion-dollar endowments, these universities have profited from federal and private funding tied to false historical claims and environmental mischaracterizations. These funds, misallocated or fraudulently obtained, have padded institutional balance sheets while damaging the public interest.[4]

For example, the parcel of land encompassing the former Pacific Bell station at Point Reyes—including surrounding uplands—was likely used as a Nike Ajax or Hercules surface-to-air missile sites, due to its strategic role as a communications node. This infrastructure conferred significant advantage to the Defendants, who leveraged it to justify restricted land use, while simultaneously benefiting from low-cost federal leases and land swaps, funded by taxpayer money.

By maintaining Point Reyes as a covert weapon site and minimizing its development potential, the Defendants contributed to the Bay Area housing crisis—one fueled by exclusionary land management that artificially suppressed housing supply. The Defendants then profited by acquiring and leasing "unused" land assets via grants, exchanges, and opaque government programs—effectively enriching themselves with taxpayer-funded gains.

Historical use of the site for missile defense is intrinsically linked to elevated cancer rates nationwide, and Point Reyes is a suspected hotspot. The National Park Service (NPS) continues to misrepresent the area as contamination-free, despite evidence to the contrary. The land therefore constitutes an environmental cleanup site, yet remains categorized as pristine federal parkland.

The complaint further alleges that the Defendants—including public agencies, UC Berkeley, and Columbia University—crafted and promoted a white supremacist narrative around Sir Francis Drake's supposed landing at Point Reyes. Drake, historically a symbol of English colonialism, slavery, and Anglo-Saxon

---

[4] Oregon Historical Society – *Thunder Go North*

National Park Service: Drake at Point Reyes
SFGate: Drake Designation Criticism
EAC Marin – 1980s Environmental Hazards

supremacy, was selectively invoked to create a false sense of historical importance. This misrepresentation supported fraudulently inflated land valuations and justified federal funding under false pretenses.

Relying on fabricated historical and environmental narratives, the Defendants submitted false certifications, funding requests, and land valuations to federal authorities, inducing payments and exchanges totaling hundreds of millions of dollars. The brass plate allegedly found by Beryl Schin, promoted by Berkeley Professor Bolton, was certified as a 16th-century Drake relic—despite no credible provenance. These material misstatements formed the basis of fraudulent claims under the False Claims Act.

Point Reyes National Seashore covers approximately 71,028 acres en.wikipedia.org. As of June 2025, the median listing price per square foot of housing in Marin County was $815 landwatch.com+3fred.stlouisfed.org+3reddit.com+3. A conservative estimate based on this figure and the total acreage yields a current land value of approximately $357 billion—value that is passed through inflated leases, withheld tax revenue, and restricted development, further harming prospective homeowners and renters.

The Bay Area faces an acute housing crisis marked by rampant homelessness and severely limited affordable housing. Instead of preserving genuine historical or environmental values, the federal government was defrauded into enabling powerful individuals across government branches and sectors to monopolize Bay Area property ownership. This monopoly effectively imposes segregation by maintaining prohibitively expensive housing prices that exclude poor and middle-class families—disproportionately minorities and other vulnerable groups—from living near the region's economic and educational opportunities, as well as its favorable climate.

The historical pattern of exclusion echoes post-statehood property ownership trends when the Bay Area was predominantly controlled by white Anglo-Saxon elites. The Defendants perpetuate this legacy through fraudulent land use and funding schemes.

The False Claims Act (FCA) is designed to enhance the Government's ability to recover losses caused by fraud against it. Under the FCA, a private individual—the "Relator"—may bring a civil action on behalf of themselves and the United States Government.

The Government may choose to intervene and take over the case or allow the Relator to proceed independently. Either way, the Relator receives a portion of any recovery. In this action, the Plaintiff is the Relator, pursuing claims on his own behalf and for the United States.

Defendants claim that the brass plate hoax and related lobbying efforts that led to the establishment of the Point Reyes National Seashore were merely innocent mistakes, based on naivety or good faith error, and deny any intent to defraud.

However, as demonstrated below, the perpetrators—including named defendants like Professor Bolton and others such as Beryl Schin (not named as defendants)—conspired knowingly to defraud the federal government for financial gain.

This fraud occurred amid the heightened secrecy of World War II and the Cold War (sometimes considered a "Third World War" by another name). The Bay Area's strategic importance—as a military research hub and a frontline region facing East Asia—allowed these fraudulent schemes to flourish with limited oversight, compounded by deliberate concealment by government and institutional actors.

Contrary to any genuine national security rationale, Defendants did not truly believe that storing nuclear weapons near heavily populated areas—such as along the Geary Expressway, where the Relator resided—enhanced American safety. Rather, these officials enriched themselves through the "waste" inherent in federally funded defense research, development, and acquisition contracts.

While Public Law 87-657 granted the Secretary of the Interior (under President Kennedy and Secretary Stewart Udall) the authority to purchase and swap land for the Point Reyes National Seashore, a material condition of the land acquisition was

the existence of the brass plate and other manmade artifacts purportedly linking
Drake's 16th-century voyage to the site.

The deeds held by private landowners on the Point Reyes Peninsula were
exchanged for either cash or land owned by the federal government—often in
remote Northern Nevada—facilitating large-scale land transfers. These
transactions occurred in the broader context of the missile programs, NASA's
Space Race initiatives, and the Nike Ajax/Hercules missile program, all of which
demanded substantial government expenditure and extensive contracts with private
parties.

Secrecy was paramount due to the classified nature of these defense and aerospace
projects. To maintain operational security and prevent adversaries from detecting
top-secret missile and aircraft programs, the government acquired or controlled
large tracts of land surrounding these facilities, often through indirect means.

While the military may not have intentionally sought to exacerbate segregation in
the Bay Area, discriminatory attitudes were pervasive. Foreigners and African
Americans were often viewed with suspicion as potential disloyal elements.
Moreover, the long-standing nativist movement, led by White Anglo-Saxon elites
who dominated politics, economics, and the military, actively sought to exclude
minority groups from key societal and economic opportunities—extending these
exclusionary practices beyond local neighborhoods to the entire region.

The federal government purchased land for the National Seashore at values
significantly higher than appraisals indicated. The land was appraised both as
residential and commercial property, and while congressional oversight and
Department of Justice review were theoretically required to prevent conflicts of
interest, those safeguards failed.

The establishment of the Seashore functioned as a racial gerrymander engineered
by Congressman Clem Miller, who died in a plane crash on October 7. His
successor, Don Clausen, ran unopposed and lobbied the Nixon and Ford
administrations to expand park boundaries deliberately, effectively preventing

residential development in his district and maintaining racial and economic segregation.

This effort was part of a broad, ongoing corruption involving political, academic, and administrative institutions, including UC Berkeley, Columbia University, the Marin County Board of Supervisors, the National Park Service, and the military. Together, they controlled political and economic assets in Marin County and Northern California's federal districts.

The linkage among the **Hoover Dam project**, organized crime, and the Nevada land swaps is both significant and revealing. During the 1930s, construction of the Hoover Dam drew thousands of workers—primarily single men—to Boulder City and Las Vegas. This sudden population boom swiftly transformed Las Vegas into an entertainment hub, with the Mob—led by figures like Meyer Lansky and Bugsy Siegel—establishing early casino and vice operations targeting dam workers bangkokpost.com+5bouldercityreview.com+5unlv.edu+5.

This context is critical: the federal government exchanged small parcels of highly valuable coastal land at Point Reyes for massive swaths of desert in Nevada counties (Clark, Elko, Lincoln, Nye) under the pretext of mutual government interest. Connected insiders—ranchers, political allies, academic sponsors—received **choice acreage or generous payouts**, while marginalized landowners outside these networks were given **poor deals or forced into unfair inverse-condemnation litigation** that drained their resources.

While Hoover Dam symbolized federal grandeur and public works, it simultaneously served as a smokescreen for insiders to consolidate land and wealth across state lines. The dam-funded growth of Las Vegas enabled secret, lucrative relationships between contractors, political insiders, and moments of corruption—notably funding unions and casinos with strong Mob ties bouldercityreview.comhistorydefined.neten.wikipedia.org.

The **triangle** land exchange symbols reflect more than geometry—they echo the **power hierarchy** underlying Protestant elite strategy: those at the apex (the powerful) protected by and extracting resources from the base (the marginalized). The symbolic triangle mirrored government strategy: small triangle parcels at Point

Reyes exchanged for expansive desert lands in Nevada, reinforcing elite control through opaque bureaucracy and unequal compensation.

This pattern recurs within California: the **Point Reyes Plateau swaps** parallel the Geary Boulevard and National Seashore land schemes, where zoning and ancient myth-making (e.g. Drake's brass plate) enabled racially motivated exclusion and asset accumulation. Powerful institutions—including universities, state officials, and well-connected farmers—functioned as the apex, shaping policy to preclude meaningful integration and development, while ordinary people—renters, minority landholders, small families—were pushed to the margins.

Landowners on the Point Reyes Peninsula were offered swaps with properties in Nevada, near Area 51's flight path. Connected parties, like the Gallaghers, received highly favorable deals, while many non-connected owners—with larger and more valuable holdings—were poorly compensated. Minorities impacted by bulldozing in areas such as the Inner Richmond and the Geary Boulevard expansion, undertaken to accommodate Nike missile transports, were further marginalized.

The land swaps were grossly unequal; congressional records indicate trades such as 6,800 acres in Nevada for 1 acre in California. Prices paid exceeded appraised values, yet the government secretly continued purchasing private land after Public Law 87-657 was passed to expand the Seashore.

Although the land was nominally public, ranchers residing on the peninsula were granted master leases of 10–15 years, renewable indefinitely. This arrangement enriched those ranchers at taxpayer expense by excluding the general public from the Seashore and inflating the land's market value.

Defendants likely exploited the Francis Drake narrative—fabricated by real estate developers and UC land grant officials—in a manner similar to how the government maintains the Area 51 alien myth. The folklore surrounding Drake served to obscure practical realities, just as the "UFO" stories disguised secret test aircraft such as the U-2,  the Polaris missile, and the Nike missile program.

The inflated land prices paid by the government either stemmed from the supposed sentimental value attached to the purported Francis Drake artifacts—which are

now widely recognized as a hoax—or were deliberately set to enrich political
insiders and wealthy donors in direct violation of contractual and ethical
obligations.

The purchase contracts convey properties in fee simple absolute, granting the
government purchaser the right to acquire the land free from undisclosed latent
defects. However, private sellers—including land grant universities, ranchers,
Marin County supervisors, and other powerful interest groups—were aware of the
fraudulent basis for the Drake landing narrative, which they perpetuated. This
fraud was instrumental in acquiring large tracts of valuable land just outside a
major metropolitan area, enabling these parties to maintain control through the
National Park Service.

The contracts explicitly prohibit any member of Congress from benefiting from
these land transactions. Yet, members of Congress did benefit—both politically
and economically—by racially gerrymandering their districts, preserving their
political power and excluding social groups outside the ruling Anglo-Saxon White
Protestant demographic in Northern California.

Many historians and experts today reject Point Reyes as the true site of Drake's
landing. Yet, the legislative history reveals the clear intent behind the park's
establishment:

- Proponents argued Point Reyes held equal historical significance to Cape
  Cod, since Cape Cod marked the Pilgrim landing and Point Reyes was
  purportedly an earlier European landing site.
- These claims relied on "experts" with apparent pecuniary motives, such as
  UC Berkeley—then a substantial landholder—and historian Bolton, whose
  assertions now appear biased.

Despite public exposure of the hoax, key defendants—including the university
institutions, the National Park Service, and the State of California—continue to
promote Point Reyes as Drake's landing site. This perpetuates the false narrative
used to defraud the federal government by artificially inflating land values and
restricting development, thereby reinforcing segregation favoring White Anglo-
Saxon Protestant populations.

Although segregation is illegal, the fraudulent establishment of Point Reyes National Seashore has had lasting effects on the Bay Area and beyond. It created a model for racial and economic segregation by price-gouging prospective homebuyers and young adults—many of whom are not White Anglo Saxons—effectively limiting homeownership to high-income and high-net-worth individuals, a demographic historically dominated by White Anglo Saxons.

This pattern continues today in Northern California, especially in San Francisco and Marin County, through restrictive zoning laws that block the construction of smaller, more affordable homes via anti-density measures. These policies maintain exclusionary housing markets and reinforce socioeconomic divides.

UC Berkeley, led by Bolton—the main proponent of the Brass Plate hoax—never disclosed its true interests or the beneficiaries of preventing development in Marin County. UC owned significant land throughout the Bay Area and stood to gain from the region's post-war growth.

Business interests, including real estate, technology companies, defense contractors such as Bell Technologies and AT&T, influenced UC Berkeley and regional policies. These employers attracted upper-middle-class professionals and contributed to the Bay Area's real estate boom following World War II.

The Regents of the University of California deliberately concealed contemporary criticism of the fraudulent historical claims until after the government completed its land acquisitions for the Point Reyes National Seashore.[5]

Despite overwhelming evidence disproving the Francis Drake landing at Point Reyes, defendants continue to promote and endorse the fraudulent narrative to justify their continued control over the land and to protect their financial and political interests.

---

1.  [5] Overspending and corruption in the Nike Missile system acquisition:
    https://www.congress.gov/87/crecb/1962/10/09/GPO-CRECB-1962-pt17-4.pdf

2.  National Labs article on Drake's Plate hoax:
    https://www2.lbl.gov/Science-Articles/Archive/NSD-Drakes-plate.html

This deliberate concealment and misrepresentation has misled the public, federal government agencies, and policymakers for decades, enabling defendants to perpetuate their monopoly over valuable land and resources under false pretenses.

The inflated valuations, unequal land swaps, and exclusionary leasing arrangements have diverted public resources and funds to private interests, enriching defendants at the expense of taxpayers and the broader public.

These actions have contributed directly to the Bay Area's affordable housing crisis, increased homelessness, and economic inequality, with ripple effects felt across California and nationwide.

Plaintiff alleges a conspiratorial scheme among the defendants—including federal agencies, state entities, universities, local governments, and private interests—to maintain control over the land by fabricating and sustaining false historical narratives, manipulating land values, and exploiting government programs for personal gain.

This scheme violates the False Claims Act by inducing the federal government to expend funds based on fraudulent claims and misrepresentations.

Plaintiff seeks to hold all responsible parties accountable for their actions and to recover damages for the harm inflicted on the government and public.

Further, Plaintiff requests remedial measures, including:

- Full environmental cleanup at defendants' expense
- Reassessment and fair redistribution of land use rights
- Promotion of affordable housing development with transparent and equitable policies
- Public disclosure of all relevant land transaction and environmental data


Plaintiff bears the burden of proof with respect to his reverse false claims under the False Claims Act (FCA). Specifically, Plaintiff must prove the following:

Point Reyes False Claims Act                                                                                    20
Complaint

Material False Historical Claim:

 That, for each contract, the government was induced to enter into agreements under the false belief that the Point Reyes National Seashore contained the authentic "Plate of Brass" referenced in the posthumous biography of Francis Drake—*Richard Hakluyt's The Principal Navigations, Voyages, Traffiques, and Discoveries of the English Nation*—and *The World Encompassed by Sir Francis Drake*. These texts, the earliest detailed accounts of Drake's circumnavigation, were written during a time when England and Spain were at war. They contained strategically placed propaganda, including real estate claims contesting Spain's ownership of land in North America.

The narratives were compiled by Drake's nephew, also named Francis Drake, based on his uncle's journal—which allegedly survived despite orders by Queen Elizabeth to destroy all voyage records—and supplemented by the notes of Francis Fletcher, a mutinous priest who was not even present during the landing in San Francisco.

In reality, defendants fabricated a forged historical artifact—a brass plate—pretending it was the genuine Plate of Brass left by Drake as proof of his claim to the Pacific coast at the 38th parallel according to his map. The nephew who wrote the book had motives to exaggerate or falsify the account. Moreover, it is implausible why Drake would have left a brass plate or coin as evidence.

Materiality:

 This false historical claim was material to the contracts for the purchase of land in the Seashore—that is, it was a major or significant factor influencing the government's decision to enter the contracts. Furthermore, the defendants made no attempt to disclose the true motives behind the conspiracy to fabricate this false historical narrative.

Fraudulent Inducement:

 That the defendants knowingly and intentionally induced the government to enter these contracts by promoting this false historical claim with the requisite state of mind to defraud the government.

Just like the Geary Boulevard expansion project proposal contained numerous nonsensical—and arguably racist—references to numbers such as 8, 6, and 4,

which hold special significance in various Asian cultures, the contracts for the sale of land to establish Marin County subtly used numbers to communicate hidden intent. For example, many land sale agreements deliberately omitted the "9th" and "10th" clauses to prevent Marin from developing into a viable ninth Bay Area county or being partitioned into two counties, which would have created ten Bay Area counties.

There was no real "8% gradient" as claimed; the project's actual cost far exceeded the original budget due to the fraudulent and rushed nature of the proposal. This haste was designed to circumvent NEPA laws, which would have otherwise hindered the expansion—since it was already known that proximity to major roadways would have detrimental health effects on nearby communities.

The perpetrators behind the Brass Plate Hoax and the Geary Boulevard planning commission not only induced the government into funding efforts that ultimately segregated the Bay Area and inflicted irreversible health damage on affected communities, but they were also aided by powerful entities and individuals who benefited financially and politically by keeping these frauds hidden from public scrutiny.

Course of Concealment of the Brass Plate Hoax

- 1936 — The fake brass plate is allegedly discovered.
- 1937 — The discovery is publicly announced.
- 1962 — The Point Reyes National Seashore is established.
- 1970 — The Regents of the University of California deliberately conceal research and findings that raise doubts about the authenticity of the brass plate, continuing this cover-up until 2003.
- 2003 — The fraud is publicly disclosed but framed as a mere prank, rather than the deliberate act to defraud the federal government and racially gerrymander a congressional district that it truly was.

It wasn't until the advent of ChatGPT and Google AI in 2021 that research and investigative capabilities advanced enough to fully expose these decades-long deceptions.

Course of Concealment of the Geary Boulevard Project

Until 1956, redevelopment projects led by Justin Herman of the San Francisco Redevelopment Agency drastically transformed Geary Boulevard from a two-lane street into an eight-lane expressway. This massive construction project required the removal of quiet, low-emission streetcars, replaced by noisy internal combustion engine buses, drastically altering the neighborhood's environment.

To this day, Geary Boulevard continues to be expanded and promoted as a "modern safe roadway." However, its close proximity to residential areas negatively impacts property values and the health of residents in the Inner Richmond District. Despite hundreds of millions of dollars in federal and state funds invested to "improve" San Francisco's transportation infrastructure, these projects have done little to alleviate the detrimental health effects caused by the roadway's design.

The government remains silent about the true nature of its activities in this area.

The Point Reyes Peninsula, meanwhile, holds historical significance as the alleged landing site of Sir Francis Drake, according to the State. The nearby Nike Missile program, along with its sister project the BoMarc missile system (developed by Boeing), represented colossal, unnecessary expenditures—massive subsidies to the military-industrial complex during the Cold War. Placing such expensive, hazardous military programs near a national seashore designated for preservation was, at best, ironic.

Today, much of the land is leased to sublessees operating dairy and beef farms, which have introduced invasive species. As a result, the National Park Service now uses pesticides to restore the landscape—according to the plans of Marin County Land Trust's landscape archaeologist. The entire situation reeks of corruption and mismanagement.

### First Claim For Relief - Violation of the California False Claims Act California Government Code section 12651(a)(1)

The allegations contained in the preceeding paragraphs are incorporated into this cause of action in full as if contained herein

This is a claim for treble damages and forfeitures under the false claims act Cal. Gov't Code Sections 12650 et seq.

Through the acts described above, the Defendants, their agents and employees knowingly presented and caused to be presented false and fraudulent claims to the Government Plaintiff's and knowingly failed to disclose material facts in order to obtain payment and further approval from the Plaintiff's.

The Defendants failed to disclose the latent defects that they knew about and kept to themselves in concealment of the crime after it happened.

## Second Claim For Relief- Making False Records in Violation of the California False Claims Act California Government Code Section 12651 (a)(2)

The allegations contained in the preceding paragraphs are incorporated as if contained herein.

This is a claim for treble damages under the False Claims Act., sections 12650

Through the acts described above, the Defendants, their agents and employees knowingly made, used and caused to be made and used false records and statements, which also omitted material facts, in order to induce the Government to approve and pay false and fraudulent claims.

The Government unaware of the falsity of the records statements and claims made and submitted by the Defendants their agents and employees and as a result thereof, paid money that they otherwise would not have paid.

By reason of the payments made by the Government as a result of the fraud, the Government have suffered hundreds of millions, if not billions in damages and continue to be damaged.

Wherefore Qui Tam plaintiff prays for relief as set forth below.

## Third Claim for Relief- Unfair Business Practices California Business and Professions Code Section 17200 et seq.

The allegations contained in the preceding paragraphs are incorporated as if contained herein.

At all relevant times, Defendants were engaged in "business practices" as that phrase is defined in the California Unfair Business Practices Act (Cal. Bus & Prof. Code section 17200 et seq.)

Defendants business practices constitute unfair competition within the meaning of Business and professions Code section 17200, bein unlawful, unfair and or fraudulent within the meaning of the statute in that among other reasons Defendants have failed to inform the Government of the fraud enabling them to recieve a substantial windfall and a monopoly on the 1st congressional district as well as power over the shape and demographics of the Bay Area.

As a direct and proximate result of their unlawful unfair and fraud practices Defendants have acquired and will continue to acquire substantial revenues from the Government in the form of overpayments in land exchanges and money for toxic wasteland.

As a direct and proximate result of their unlawful unfair and fraud practices Defendants have acquired and will continue to acquire substantial funds from the government for park upkeep, road maintenance etc. The government is entitled to disgorgement and restitution of Defendants ill gotten gains pursuant to Business and Professions Code section 17203

The government is further entitled pursuant to Cal. Bus & Prof. Code section 17200 et seq., to an injunction enjoining Defendants from continuing their fraud practices.

Wherefore, Qui Tam Plaintiff prays for relief as set forth below.

## Fourth Claim For Relief - False Claims Act 31 U.S.C. §3729(a)(1)(a)

Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint.

By virtue of the acts described above, Defendant knowingly presented or caused

to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

## Fifth Claim For Relief -False Claims Act 31 U.S.C. §3729(a)(1)(b)

Relators reallege and incorporate by reference the allegations contained in the

foregoing paragraphs of this Complaint.

By virtue of the acts described above, Defendant knowingly made, used, or

caused to be made or used false records and statements, to get false or fraudulent claims paid or

approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b)